UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>NORMAN DAVID WEST,<br>    Defendant. | CRIMINAL NO. 5:22-CR-40-KKC-MAS<br><br><br>**OPINION AND ORDER** |

*** *** ***

This matter is before the Court on defendant Norman David West's (West) motion to suppress. (DE 23). The evidence at issue is approximately 54 grams of fentanyl that Kentucky State Police (KSP) seized pursuant to a body search after a traffic stop. The search was warrantless, and the only applicable exception to the warrant requirement that the government argues is consent. Absent consent, the government argues that the evidence should survive exclusion because the inevitable discovery doctrine applies. Having conducted a hearing (DEs 37, 38) and having reviewed the parties's supplemental briefing (DEs 49, 50), the Court finds that West did not consent to the search precipitating the seizure. Further, the Court finds that the inevitable discovery doctrine does not apply to the facts at hand. Accordingly, the Court will GRANT the motion.

## I. Factual Background

### The operation

West was the subject of a controlled buy operation coordinated by a High Intensity Drug Trafficking Area (HIDTA) team.[1] West was in contact with a confidential informant working alongside the HIDTA team, and West and the CI formed a plan for a heroin/fentanyl exchange at a Holiday Inn off the interstate near Berea, Kentucky. (DE 45 at 10-13). The HIDTA team had been monitoring West's communications and had amassed texts, Facebook messages, and photos related to the drug deal. The initial plan was for a "buy/walk," in which the HIDTA officers would use the CI to buy the drugs from West and then allow him to leave. Under this operation, West would not have been arrested after the sale. (*See id.* at 13-14).

At some point before the scheduled buy/walk, while West was en route to the scheduled exchange, the plan changed. (*Id.* at 15). According to HIDTA team officer Keith Parke, the plan changed because he and his supervisors felt the CI may be in danger—specifically that "[West] was going to have the confidential informant strip down and be naked to confirm that there was no wires." (*Id.* at 16). The new plan was to have the KSP interdiction unit intercept West as he traveled south on the interstate. (*Id.* at 17). Officer Parke testified that his sergeant called the interdiction team and relayed information about West—primarily his name, appearance, and that he would be traveling in a rental car. (*Id.* at 43). The interdiction team was also made aware of the initial plan and why it has been aborted. (*Id.* at 51-52). Though HIDTA officers felt they had probable cause to arrest West based on the communications with the CI, the HIDTA team specifically instructed the interdiction team to develop their own probable cause for arrest. (*Id.* at 58-59, 66). The explicit purpose of this was that the HIDTA team "wanted to keep the informant

---

[1] HIDTA is within the Drug Enforcement Special Investigations unit, which is under the Kentucky State Police umbrella.

going because they were actively working other cases." The HIDTA team wanted to "ultimately use them on other buy/walks." (*Id.* at 59). Officer Parke testified that an arrest premised on something other than the texts and scheduled drug buy would perhaps convince West that the arrest was random. This would maintain the CI's cover. According to Parke, the HIDTA team tries "to keep them so that their name is not mentioned or the person arrested is not familiar with the person that actually set them up." (*Id.*) Once an informant is blown, the HIDTA team can no longer use them in narcotics sting operations. (*Id.*) Further, exposing the CI is "putting them in a safety risk." (*Id.* at 60).

## The traffic stop and subsequent searches

Pursuant to the new plan, KSP executed the traffic stop on West. His father, Norman West, Sr., was driving and West was his passenger. According to officers, their car made an abrupt and reckless U-turn and the stop was based on careless driving and possible DUI. (DE 28 at 2).

At the outset of the traffic stop KSP officers detected an odor of marijuana and ordered West and his father out of the car. (DE 23-1 at 3). Officers performed a quick field sobriety test on West, Sr. and determined that he was not intoxicated. West, Sr. denied consent to search the car and the officers deployed a canine for an open air sniff, which made a positive identification for narcotics on the car. (*Id.*). Because the dispositive facts regarding the consent issue are confined to police interactions with West, the Court will focus on the three searches of West's person.

The first search occurred as soon as West exited the vehicle. A KSP officer asked West if he "had any rocket launchers" on him and proceeded to pat West down. (Ex. E at 3:01). At one point West asked the officer if he "wanted him to pull out his pockets for him." (*Id.* at 3:18). This first search lasted about 20 seconds.

About three minutes later, West was detained and handcuffed. Shortly thereafter, officers began a more thorough search of the car. (*Id.* at 6:40). Officers did not find narcotics after searching the car for about nine minutes. Afterward, they began the second search of West's person. A KSP officer asked "you got anything on your persons" and simultaneously began patting West's waistband area. (*Id.* at 15:01). Officers never asked West for consent and although he was compliant with the officer, West never gave verbal consent for the search.

After about fifteen minutes, Officers searched West a third time. (Ex. F at 0:01). Two KSP officers began the search, but after about a minute a third officer joined. Shortly thereafter, KSP Sergeant Owens took a knife and cut West's underwear off his body. (*Id.* at 0:57). This search revealed that fentanyl was hidden in West's underwear. The search was captured on bodycam and dashcam footage, which shows that the handcuffed West did not resist the officers. The footage, however, provides no evidence that West consented to this search—either verbally or by gestures.

KSP officers testified that they were not looking for weapons during the second and third searches and were unequivocally looking for the drugs that were the subject of the narcotics investigation. (DE 45 at 21). At no point did the officers find any contraband in the car. The only drugs police found were the 54 grams of fentanyl recovered from West's underwear upon the third body search, roughly 30 minutes into the encounter.

## II. West did not consent to the search

A warrantless search is per se reasonable if the person "freely and voluntarily gives consent to the search." *Harris v. Klare*, 902 F.3d 630, 635 (6th Cir. 2018). Consent must be "unequivocal, specific and intelligently given, [and] uncontaminated by any duress or coercion." *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011). The government bears the burden of proving,

through "clear and positive testimony" that consent was given. *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998).

The main question when consent is at issue is whether the defendant exhibited true, voluntary consent as opposed to mere acquiescence to authority. The analysis must consider the totality of the circumstances and is necessarily fact-dependent. *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992) ("Whether a consent is given voluntarily or is the product of duress or coercion either express or implied is a question of fact to be viewed by the totality of the circumstances."); *see also United States v. Cowan*, 704 F. App'x 519, 523 (6th Cir. 2017) (collecting cases). Importantly, "a request by an officer does not mean that every affirmative response by a defendant is voluntary consent; on the contrary, if a reasonable person would have felt that he were not free to walk away and ignore an officer's request, he is already seized." *Id.*

Consent does not have to be verbal. Gesturing alone—like assuming a pat down position or raising one's arms—can be evidence of voluntary consent (even absent any words). *See id.* at 524; *United States v. Drayton*, 536 U.S. 194, 198-99 (2002). But strong gesturing or even verbal acknowledgment is not always enough to signify consent. *See, e.g., United States v. Pedicini*, 804 F. App'x 351, 354 (6th Cir. 2020) (no consent, despite raising of arms and nodding of head, when police did not give suspect a chance to respond to the request for a pat down); *Beauchamp*, 659 F.3d at 572 (no consent based on the totality of the circumstances, even with a verbal "yes").

The government argues that West consented to the initial search shortly after exiting the vehicle and that consent was never revoked. According to KSP officer testimony, the sole purpose of this initial search was to check for weapons. (DE 45 at 101). This sort of cursory pat-down for weapons to promote officer safety is legal with or without consent as a permissible frisk under *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny. Because the officers knew a little about the

operation and narcotics canines had already alerted, they likely had an articulable suspicion justifying the *Terry* frisk. Accordingly, this initial search was a standard *Terry* search.

The government maintains that the initial pat-down of West took place with his consent. Even so, however, nothing in the record indicates that West consented to two additional searches—both of which were not geared toward officer safety but were instead for the purpose of finding contraband.

During the second and third searches West was held handcuffed at the scene. During the second search, officers did not request West's consent, they merely approached West and began searching him. While West did not resist the officers, he was not free to walk away. He was already detained. The same is true for the third search which occurred after West had been detained and handcuffed for more than twenty minutes. Officers had already searched him twice and he was surrounded by three KSP officers who never asked for his consent to an additional search. Nothing on the bodycam or dashcam footage suggests that the handcuffed West gave any sort of gesture signaling clear, unequivocal consent. As with the second search, West was handcuffed, detained and surrounded by officers. West was neither free to walk away nor could he have reasonably believed that he could refuse the search. *See Beauchamp,* 659 F.3d at 572 (even a verbal "yes" does not confer consent when the circumstances suggest police conduct has overborne a suspect's will because at that point, the suspect "is not in a position to say no to a police officer whose hands are still on or just removed from his body while another officer is standing just a few feet away"). At the time of the search, a reasonable person would have felt that they had no choice but to acquiesce. *See Cowan*, 704 F. App'x at 523.

Further, when officers began cutting and ripping at his underwear, West asked with exasperation, "y'all gonna cut my underwear off?" At this point, West recognized the futility of

any resistance to the search and the Court finds that he was merely acquiescing to authority. *See United States v. Worley*, 193 F.3d 380, 386 (6th Cir.1999) (expressions of futility in resistance to authority are not consent).

The government argues that West's "consent" to the first search somehow carried over to both the second and third searches. Even if West had consented to the initial *Terry* frisk, that consent does not extend to two more invasive searches for contraband. The scope of the consent determines the permissible scope of the search. *United States v. Dishman*, 12 F. App'x 289, 292 (6th Cir. 2001) (citing *Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991)). After the *Terry* frisk, officers detained and handcuffed West. An initial consent to a pat down search for weapons cannot persist when the scope and nature of the search changes to a more invasive search for contraband.

In sum, the Court finds that West did not consent to the search in which contraband was found in his underwear. The government has failed to show that West implicitly or explicitly consented to either search for contraband. Accordingly, the contraband was unlawfully obtained.

### III. The inevitable discovery doctrine does not apply

The inevitable discovery doctrine "allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995). This doctrine is an exception to the exclusionary rule, which prohibits evidence obtained through unconstitutional searches and seizures. For the doctrine to apply, the government "must demonstrate the existence of an independent untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Wilson*, 806 F. App'x 450, 454 (6th Cir. 2020) (internal quotations removed).

The doctrine does not apply unless it was inevitable that routine procedures would have uncovered the evidence in question. *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999). Though the doctrine requires courts to do some barebones gap-filling, it is not appropriate for the Court to over-speculate or accept conjecture from the government. *United States v. Mohammed*, 512 F. App'x 583, 587 (6th Cir. 2013) ("Though some speculation as to how events would have unfolded, absent an illegal search, may be necessary, we must keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment." (internal quotations removed)); *see also Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984) ("[I]nevitable discovery involves no speculative elements . . . .").

When considering whether the inevitable discovery doctrine should salvage evidence obtained through an unlawful search, the Court must "determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Kennedy*, 61 F.3d at 498. The question of the "inevitability" of any particular course of events is necessarily fact-dependent. *See United States v. Dillard*, 78 F. App'x 505, 514 (6th Cir. 2003). Thus, what is inevitable in one situation may not be in another. The facts in search and seizure cases are often complex and almost always unique—especially when the government invokes inevitable discovery. Ultimately, the Court must determine whether the evidence discovered during the illegal search "would have been discovered during a later legal search and the second search *inevitably* would have occurred in the absence of the first." *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) (emphasis added).

If West had been arrested, a legal search incident to arrest or upon processing would have led to discovery of the fentanyl in West's underwear. The question then becomes whether the

police intended to arrest West at the moment before the illegal search commenced. Here, the answer is not sufficiently clear to support a finding that the arrest was inevitable.

> The following is testimony from HIDTA officer Parke:
>
> The Court: Now, as I understood your testimony yesterday, you said you hoped that the interdiction team would develop its own probable cause for arrest; is that correct?
>
> Officer Parke: That is correct, yes, ma'am.
>
> The Court: Did I also understand you to say that you were doing this to protect the informant?
>
> Parke: Correct, yes, ma'am.
>
> The Court: Okay. What was your plan if the interdiction team had not found the drugs? What were you going to do?
>
> Parke: At that point in time, it had been discussed with my sergeant to get approval basically to go ahead and place Mr. West under arrest from the information that I had with him previously and with the information that had been relayed to me through Detective Harrison that, you know, ultimately at the end of the day that we were going to have to place him under arrest due to some circumstances that wasn't going to allow us to further the investigation.
>
> The Court: All right. And so, if this whole search had not occurred or if the officers had just given up when they did the initial pat-down and the second search, what was your plan?
>
> Parke: It had been discussed with my sergeant being in the vehicle that I was just going to go up and place Mr. West under arrest on the trafficking charges with the totality of the text messages, pictures that I was relayed that I had, so the information that I had in everything to go ahead and place Mr. West under arrest if interdiction did not find narcotics.

(DE 44 at 28-29). From this testimony, it is not clear whether or when the HIDTA team made a firm decision to arrest West. According to all accounts, West could have been arrested based on evidence already in police possession – the texts and photos West exchanged with the CI. But the HIDTA team did not perform or authorize an arrest. Instead, they positioned themselves at a gas station adjacent to the scene and waited for the interdiction team to develop independent probable

cause for arrest by locating contraband. The evidence is clear that no definitive moves toward arrest occurred until after the drugs were uncovered through an illegal search. (*See* DE 45 at 29).

HIDTA officers testified that in aborting the planned controlled drug exchange with West, the team had focused on the safety and continued utility of the CI. (*See* DE 45 at 119). Sergeant Chavies testified during cross examination:

> Defense: . . . Just seems odd to me if it's a dangerous situation that you guys -- and you're going to arrest him anyway, you're across the street, and you don't just come over and do it. I mean, do you have an explanation?
>
> Chavies: For?
>
> Defense: Why you didn't come across and arrest him if you're going to arrest him anyway?
>
> Chavies: Well, to some degree, probably to protect, you know, as long as we can protect the fact that we have a cooperating witness with us.
>
> Defense: I know we heard a little testimony about not wanting to reveal the informant's identity, but let me ask you this. Wouldn't it have been pretty obvious if these officers, multiple KSP units, they keep on searching, they don't let anybody go, and then they finally uncover the drugs that Mr. West is supposed to be bringing to the CI at this location and they arrest him, wouldn't it be pretty obvious to Mr. West that that was a CI that he's trying to go sell these drugs to?
>
> Chavies: Not necessarily. We -- I mean, the interdiction teams make traffic stops similar to this every single day, that's what they do. They have K-9s available, they have multiple units usually on a traffic stop. So it's very feasible that that wouldn't have been the case.

(*Id.* at 129). Moreover, the CI was actively involved in other cases. Officer Parke testified that "in this situation, we wanted to keep the informant going because they were actively working other cases, and so it was made to the interdiction to have their own probable cause stop to kind of keep our informant clean." (DE 44 at 58).

In determining whether the arrest was inevitable, the Court must consider the facts as they existed at the instant before the unlawful search and ask what would have happened had the unlawful search not occurred. *Kennedy*, 61 F.3d at 498. In order to protect their CI after an aborted

controlled drug transaction, the HIDTA did not arrest West. Instead, they dispatched a drug interdiction team to develop an independent basis on which to arrest West. At the suppression hearing, HIDTA Officer Parke testified that West would have been arrested if the interdiction team had not found the drugs. Officer Parke did not testify, however, that an unequivocal decision to arrest West was made before the illegal search took place. Leading up to the illegal search, HIDTA officers could have caused the arrest of West at any moment, but they did not. Without evidence that such an arrest would have occurred, this Court cannot speculate as to what might have happened absent the illegal search. Because the government has failed to prove by a preponderance of the evidence that the fentanyl would have been found through otherwise lawful arrest, the inevitable discovery doctrine does not apply.

### IV.

Accordingly, having determined that West did not consent to the warrantless search producing the evidence at issue and that the discovery of the evidence was not inevitable pursuant to arrest, the Court hereby ORDERS that West's motion to suppress (DE 23) is GRANTED.

This 21st day of February, 2023.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY